**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DISTRICT**

| | |
|---|---|
| **RYAN O'DONNELL and MICHAEL GOREE,** individually and on behalf of all others similarly situated, | ) ) ) **CLASS ACTION COMPLAINT** |
| **Plaintiffs,** | ) ) |
| **v.** | ) **Case No. _____** ) |
| **CITY OF CHICAGO, a municipal corporation, and URT UNITED ROAD TOWING, INC., a Delaware corporation,** | ) ) **JURY DEMAND** ) |
| **Defendants.** | ) ) ) |

## <u>COMPLAINT</u>

Plaintiffs Ryan O'Donnell and Michael Goree (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, complain against Defendants City of Chicago (the "City") and URT United Road Towing, Inc. ("United Road Towing" or "URT") (collectively, "Defendants") as follows:

### <u>INTRODUCTION</u>

1.     In 2017, the City of Chicago towed and impounded 19,665 cars.[1] Every last one was parked legally. No ticket was issued. They were all in good condition. None blocked traffic, or otherwise posed a hazard to the public. They were involved in no crime and their drivers were not arrested. These cars were all towed for just one reason: the City of Chicago wanted its money.

---

[1] Elliott Ramos, *Chicago's Towing Program is Broken*, WBEZ NEWS (Apr. 1, 2019), http://interactive.wbez.org/brokentowing/?_ga=2.182889636.302271072.1573669407-690195108.1572997635.

2.      Of course, the City tows far more than 19,665 cars each year.[2] These particular cars were singled out because the owners of the vehicles owed ticket debt to the City. Under the Municipal Code of Chicago ("Municipal Code" or "MCC"), as soon as a vehicle owner has two tickets that are unpaid for more than a year, or three unpaid tickets at any time, that owner faces a rapidly escalating campaign of debt collection waged by the City and its agencies. *See* MCC § 9-100-120(b).

3.      First, the City immobilizes or "boots" *any* vehicle registered in the owner's name—*even vehicles that were never involved in any citation*. *See* MCC § 9-100-120(b). The owner then has 24 hours to pay all outstanding fines, penalties, boot fees, administrative fees, attorney's fees, and collection costs or the cars will be towed and impounded. *See* MCC § 9-92-080(b); 9-100-120(c), (d).[3] In a typical case involving three speed-camera tickets, that cost is $832.[4] Most Chicagoans just cannot raise that kind of money in that little time.

4.      An owner's vehicles will be booted even if the owner never committed the infractions at issue. Red-light and speed cameras cannot identify the driver of a vehicle. So those citations, like parking citations, are issued only to the registered owner of a vehicle. *See* MCC §

---

[2] In 2017, the total number of cars towed by the City was nearly 94,000. *See* Elliott Ramos, *Takeaways From Our Investigation Into Chicago's Broken Towing Program*, WBEZ NEWS (Mar. 31, 2019), https://www.wbez.org/stories/takeaways-from-our-investigation-into-chicagos-broken-towing-program/21106328-2146-4f38-9938-7e25fc3b3b92.

[3] The owner of vehicles towed after Sept. 19, 2019 may request additional time "as provided in rules" before the tow. *See* MCC § 9-100-120(c) (eff. Sept. 18, 2019). The only extension available, however, is an additional 24 hours, and only if the claimant can make a down payment and start a payment plan. *See* Payment Plans for Booted Vehicles, https://www.chicago.gov/city/en/depts/fin/provdrs/parking_and_redlightcitationadministration/svcs/payment-plans-for-booted-vehicles.html.

[4] The cost of each ticket, including late payment penalty and collection costs, is typically $244 ($244 x 3 = $732), plus a $100 boot fee. *See* MCC § 9-100-020(d) ($100 fine); MCC § 9-100-050(e) (doubling fine if not paid in 25 days); Parking and Red Light Tickets Debt Relief Program FAQ's, www.chicago.gov/content/dam/city/depts/fin/supp_info/Revenue/Amnesty_FAQ_Parking_Red_Light.pdf (describing typical $44 in collection costs per ticket); MCC § 9-100-120(g) ($100 immobilization fee).

9-100-020(a); MCC § 9-102-020(a). As a result, the City frequently boots vehicles when neither the vehicle nor its owner were involved in any ordinance violation.

5.      Nevertheless, if the owner does not pay the debt, the booted cars are towed and impounded. The fees then accelerate: a $150 tow fee, a $20 per day storage fee for the first 5 days, and a daily $35 fee thereafter. *See* MCC § 9-92-080(b). Taking the example above and adding a tow and ten days of impoundment now raises the cost to $1,257 for just one vehicle. Every cent must be repaid in order to recover the car. *See* MCC § 9-100-120(d).

6.      The City does offer payment plans for vehicles towed after September 18, 2019. And the City offers "hardship" plans for Chicagoans with a household income below 300% of the Federal Poverty Guidelines, subject to approval of a complex application. But the "hardship" plans require a minimum down payment of $25, plus the $100 boot fee, the $150 tow fee, and all accrued storage fees. *See* City of Chicago "Payment Plan FAQs," https://parkingtickets.cityofchicago.org/PaymentPlanWeb/FrequentlyAskedQuestions. That means even hardship applicants—who, by definition, live in or close to poverty—must come up with $300 or more within four days of their application date. *See id*. Non-hardship applicants must pay 50% of all outstanding ticket debt, plus all the fees. *Id*.

7.      Being on a payment plan only raises the stakes. Failure to make the payments required under the plan results in a re-boot and re-tow, with new boot, tow, and storage fees, plus an additional $100 penalty, and a 22% collections fee. *See id*.; MCC § 9-100-160(b)(2).

8.      Plan or no plan, if a motorist fails to make the required payments, the City simply keeps the vehicle. At that point, the City can add it to its own fleet of vehicles for its own use or convert it to cash by auctioning it off or selling it for scrap. *See* MCC § 9-92-100(b)-(d). In the

vast majority of cases, the City sells the vehicle for scrap, usually for only a couple hundred dollars. *See* Ramos, *Chicago's Towing Program is Broken*, *supra* at n.1.

9.      The City does not compensate an owner in any way when it takes a vehicle in this manner. Even if it sells the vehicle, *none* of the proceeds are paid to the owner. Incredibly, the City does not even off-set the owner's debts by the amount of the sale. It simply takes it all for itself and leaves the former owner's debt as is.

10.     The City's practices have nothing to do with enforcing parking or traffic regulations or keeping dangerous drivers off the streets. Indeed, drivers that can afford to pay their tickets will never fear the boot—even when they are serial offenders. That is because the Municipal Code does not target individuals with two tickets in a year or three at any time. It only targets citizens with two *unpaid* tickets in a year, or three *unpaid* at any time. *See* MCC § 9-100-120(b).

11.     The end result is devastating: the owner loses a car—usually their most important asset and only way to get to work, school, worship services, and medical care—and is left saddled not only with the existing ticket debt, but also new boot, towing, and storage fees. Even those who are able to redeem their cars are temporarily deprived of the use of their vehicles. And all owners are saddled with boot, tow, and storage fees related to a tow that was unconstitutional in the first place.

12.     This basic story, played out thousands of times every year, is unfortunate and unwise. It is also unconstitutional. The act of booting, towing, and selling a vehicle to collect a civil debt—without using any of the proceeds to offset the debt—is a taking. Therefore, Plaintiffs, whose cars were taken from them by the City because they owed it ticket debt, bring

this suit to obtain the just compensation they are owed under the Constitutions of the United States of America and the State of Illinois.

## PARTIES

13.     Plaintiff Ryan O'Donnell ("O'Donnell") is an individual who resides within this judicial district.

14.     Plaintiff Michael Goree ("Goree") is an individual who resides within this judicial district.

15.     Defendant City of Chicago is an Illinois Municipal Corporation.

16.     Defendant URT United Road Towing, Inc. ("United Road Towing" or "URT") is a Delaware corporation with its corporate offices located in Mokena, Illinois. URT provides towing and auto pound management services throughout Chicago on behalf of the City.

## JURISDICTION AND VENUE

17.     This Court has personal jurisdiction over the City because it resides, maintains offices, and does business in this judicial district and because the actions undertaken by the City giving rise to Plaintiffs' claims arose in this district.

18.     This Court has personal jurisdiction over URT because it resides, maintains offices, and does business in this judicial district and because the actions undertaken by URT giving rise to Plaintiffs' claims arose in this district.

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that Counts I-II arise under the Constitution of the United States. This Court has subject matter jurisdiction over all other claims pursuant to 28 U.S.C. § 1367 in that they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside, maintain offices, and do business in this judicial district and because the events giving rise to Plaintiffs' claims arose in this district.

### FACTUAL ALLEGATIONS

### *The City's Boot, Tow, and Take Regime*

21.     Every day in Chicago, vehicles are towed because they are abandoned, block the public way, or pose a hazard to the public. *See, e.g.,* MCC § 9-92-030 (permitting *inter alia* the tow of cars that are abandoned or illegally parked). Still more vehicles are towed because they were used in the commission of a crime. *See, e.g.,* MCC § 7-24-225 (drug sale using vehicle); MCC § 7-24-225 (driving while intoxicated).

22.     But the cars in this case were towed for a different reason. They were towed to collect a civil debt.

23.     In Chicago, alleged violations of the City's parking, standing, compliance (*i.e.*, City sticker tickets), automated traffic law (*i.e.*, red-light camera), and automated speed enforcement (*i.e.*, speed camera) ordinances are adjudicated by the City's Department of Administrative Hearings ("DOAH"). *See* MCC § 2-14-140.

24.     If the owner of a vehicle admits to an alleged violation, fails to contest it, or contests and loses, then DOAH enters a "final determination of liability" against the vehicle owner and assesses fines and penalties. *See* MCC § 9-100-050 (providing that judgments are entered against the vehicle owner rather than the person driving at the time of the alleged offense).

25.     Under the Municipal Code, these fines and penalties "constitute a debt due and owing the city[.]" MCC § 9-100-100(b). The Municipal Code treats these debts as expressly civil

in their nature. For example, the Code provides that liens on a citizen's real estate or personal estate will be imposed once the debt is "recorded in the manner required by Article XII of the Code of Civil Procedure or by the Uniform Commercial Code[.]" MCC § 2-14-103.

26.     The City has used its unique status as a government to grant itself a suite of debt collecting powers that that would make the most cynical private debt collector blush.

27.     For example, the City has long had the power to suspend driver's licenses of persons with unpaid tickets. *See* MCC § 9-100-130.[5] It can garnish state income tax refunds. *See* 35 ILCS 5/911.3. The City will also deny, suspend, or revoke business licenses held by persons with unpaid ticket debt. *See* MCC §§ 4-4-084; 4-4-150. The City also makes extensive use of traditional debt collection agencies and bills its debtors for collection costs and attorney's fees. *See* MCC §§ 1-19-20; 1-19-030.

28.     But the City's most swift and certain debt collection tool is its power to boot, tow, and take vehicles owned by persons with ticket debt. Under § 9-100-120 of the Municipal Code, the City has the power to boot, tow, and take a vehicle whose owner has accumulated three unpaid violations. *See* MCC § 9-100-120(b). The vehicle may also be taken if just two violations go unpaid for more than a year. *See id.*

29.     Once the boot is applied, vehicle owners have 24 hours to pay up or their vehicle will be towed.[6] *See* MCC § 9-100-120(c). Once the vehicle has been towed, the owner has 31 days to pay the original underlying fines, fees, and collection costs, plus the additional boot fee, tow fee, administrative fees, and storage fees or get on a City-approved payment plan. *See* MCC

---

[5] A 2021 state law finally stopped the City from taking driver's licenses for unpaid ticket debt. *See* 625 ILCS 5/6-306.5 (repealed July 1, 2021).

[6] For vehicles towed after September of 2019, the City may, in its discretion, grant an additional 24 hours (but no more) before a tow will occur. *See supra*, n.3.

7

§ 9-100-120(f). Failing payment, the car is retained by the City and typically sold for scrap. Even motorists on payment plans face the threat of a boot, tow, and take: If a debtor misses just one payment, their vehicles will again be booted, towed, and permanently confiscated. *See* MCC § 9-100-160(e).

30.     The whole purpose of these "unpaid ticket tows" and the temporary or permanent dispossession of vehicles that follows is to coerce vehicle owners into paying the debts they owe the City. If they do not pay up, the City keeps their car for its own use or, in most cases, sells it for scrap.

31.     The City's program of booting, towing, and taking cars for unpaid ticket debt has no law enforcement function or public safety goal. After all, unpaid ticket tows only happen *after* the underlying tickets are fully adjudicated, a "final determination of liability" has been entered, and fines and penalties have been assessed. *See* MCC § 9-100-120(b). In other words, unpaid ticket tows occur only *after* the underlying ordinances have been fully and finally enforced. In the words of the City's own Municipal Code, all that remains after adjudication of these civil violations is a civil "debt due and owing the city[.]" *See* MCC § 9-100-100(b). Collecting on these debts—and ratcheting up the pressure on debtors—is the real purpose of the City's boot, tow, and take regime.

32.     Indeed, MCC § 9-100-120(b) does nothing to penalize dangerous drivers *per se*, but only those whose tickets "have not been paid in full[.]" *See* MCC §9-100-120(b). In other words, a person could be issued a red light or speed camera citation *every day* but—so long as those debts are paid—never face an unpaid ticket tow.

33.     ***Moreover, unpaid ticket tows do not even target the vehicle that was used in a particular infraction. Instead, any and all vehicles owned by a person with unpaid tickets***

*under MCC § 9-100-120 are eligible to be towed and sold*. *See* MCC § 9-100-120(b) (failure to pay outstanding ticket debt results in not just the vehicle to which the tickets were issued being put on the immobilization list, but all "vehicles of such owner"). Simply put, the City's unpaid ticket tows have no connection to public safety. Instead, they are laser-focused on putting maximum pressure on persons who owe ticket debt.

34.     Tellingly, unpaid ticket tows are administered not by the Department of Streets and Sanitation or the Chicago Police Department, but by the City Comptroller's Department of Finance. *See* MCC §§ 9-100-120 (granting authority to "traffic compliance administrator"); 9-100-010 (designating comptroller as traffic compliance administrator). That makes perfect sense given that the whole purpose of this scheme is debt collection.

35.     Having no law enforcement function, unpaid ticket tows have no public safety purpose either. The most dangerous drivers will be unaffected by unpaid ticket tows, so long as they pay their tickets on time. Even vehicles ticketed for faulty brakes (MCC § 9-76-010), no headlights (MCC § 9-76-050), or missing rear-view mirrors (MCC § 9-76-120) are safe from the tow truck so long as the City is paid on time.

36.     Just as the City does not discriminate between safe and dangerous drivers, the City does not limit unpaid ticket tows to vehicles that are hazardous, in disrepair, or otherwise dangerous to public safety. Quite the contrary: the City regularly tows and scraps late-model luxury sedans and sports cars, indiscriminately turning valuable vehicles into hunks of scrap. *See* Ramos, *Chicago's Towing Program is Broken*, *supra* at n.1 (hundreds of BMW, Audi, and Mercedes vehicles sold for scrap in 2017 alone).

37.     In 2017, the City made it explicit that the purpose of unpaid ticket tows under MCC § 9-100-120 is to collect a public debt, not enforce public safety laws. At that time, the

City amended its Municipal Code to state that "[a]ny vehicle immobilized by the City or its designee shall be subject to a possessory lien in favor of the City in the amount required to obtain release of the vehicle." *See* MCC § 9-100-120(j).

38.     The reason for the change was simple: so many Chicagoans were going bankrupt from ticket debt that—due to the automatic stay on debt collection that comes with declaring bankruptcy—the City was frequently forced to release impounded vehicles before it could collect.[7]

39.     By enforcing liens on towed vehicles, the City reasoned, it would avoid the automatic stay and keep cars until their owners paid up—bankruptcy or not. Indeed, the City publicly declared that the amendment would close the bankruptcy "loophole" and stop the "growing practice of individuals attempting to escape financial liability" and "avoid paying monies due to the City" simply because they were broke. Amend. Coun. J. June 28, 2017, p. 51164-51165. In other words, the change would allow the City to go on using unpaid ticket tows as a tool to coerce even its literally bankrupt citizens into repayment. No mention was made of public safety or law enforcement. *See generally id.*

---

[7] *See* Melissa Sanchez and Sandhya Kambhampati, *How Chicago Ticket Debt Sends Black Motorists Into Bankruptcy*, PROPUBLICA (Feb. 27, 2018), http://features.propublica.org/driven-into-debt/chicago-ticket-debt-bankruptcy/ (reporting owners of towed cars declaring bankruptcy to get their cars back); *see also* Paul Kiel and Hanna Fresques, *Chicago's Bankruptcy Boom*, PROPUBLICA (Sept. 28, 2017), http://www.propublica.org/article/chicagos-bankruptcy-boom (showing increase in bankruptcies due to Chicago ticket debt); *see also* Paul Kiel and Hanna Fresques, *Data Analysis: Bankruptcy and Race in America*, PROPUBLICA (Sept. 27, 2017), http://projects.propublica.org/graphics/bankruptcy-data-analysis ("we found large amounts of traffic-related debt, mainly owed to the City of Chicago").

40.     In sum, the City's program of booting, towing, and taking cars for unpaid ticket debt has no law enforcement function or public safety goal. Rather, the entire scheme twists the City's police powers into tools to further its own financial interests.

41.     Vehicle owners who cannot afford the City's exorbitant fines, penalties, and towing charges lose more than their car: they lose the ability to drive to work, school, medical appointments, and religious services. That is especially true for Chicagoans who live in neighborhoods that are not well served by public transit.

42.     With its many powers not available to private creditors, the City is a collections juggernaut. The City collected an estimated $345 million in fines and penalties in 2018 alone. *See* City of Chicago, 2019 Budget Overview at 29 (2018), www.chicago.gov/content/dam/city/depts/obm/supp_info/2019Budget/2019BudgetOverview.pdf That amount constitutes a full 9 percent of the City's operating revenue. *See id*. The City's revenue from the sale of scrapped vehicles is a meaningful part of that total. In 2017 alone, the City made $4,072,339.51 by selling towed cars for scrap. *See* Ramos, *Takeaways From Our Investigation Into Chicago's Broken Towing Program*, *supra* at n.2. Adding revenue from boot and storage fees raises that total by at least $10 million more. *See id*. All this money was deposited into the City's "Corporate Fund" and used to fund the City's ongoing expenses. *See, e.g.,* City of Chicago, 2019 Budget Overview at 29 (2018).

### ***Takings and the Police Power***

43.     It is one thing for the City to tow and scrap a broken-down car left in the road. Like tearing down an old building that has become a fire hazard, the City is permitted to seize and even destroy property in the interest of public safety. These kinds of property seizures are not considered constitutional takings. Instead, they are said to be exercises of the police power.

44.    "Nowadays, insofar as the expression is used in constitutional law, the phrase 'police power' normally refers to the authority of the states for the promotion of public health, public safety, public morals, and public welfare." Santiago Legarre, *The Historical Background of the Police Power*, 9 U. PA. J. CONST. L. 745, 794 (2007); *see also Ass'n of Home Appliance Manufacturers v. City of New York*, 36 F. Supp. 3d 366, 372 (S.D.N.Y. 2014) ("To be a valid exercise of police power, a municipal legislative act must bear a reasonable relationship to a legitimate purpose within the City's police powers – e.g., the promotion of the health, safety, well-being or welfare of the community.").

45.    One famous example of a constitutionally permitted seizure of private property is *Bennis v. Michigan*, 516 U.S. 442 (1996). In that case, a wife challenged the state's seizure of the family vehicle after her husband used it to solicit a prostitute. *See id*. at 443. The Supreme Court ruled that a seizure of this kind was "too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced." *Id*. at 453.

46.    Seizing property that was used to commit a crime is one thing. But the police power is not a green light for municipalities to enforce civil debts with the threat of property seizure. An act like that would be neither punitive nor remedial, much less "firmly fixed in the punitive and remedial jurisprudence of the country." *Bennis*, 516 U.S. at 453. Indeed, the City's collection practices only punish non-payment, not any underlying offense. And they remediate nothing, except a private civil debt.

47.    A municipality might be permitted to seize property in order to satisfy a debt, but the municipality must still reduce or "set off" the debt by the value of the property seized. But the City does not even do that: it simply keeps everything for itself.[8]

48.    Not coincidentally, the Seventh Circuit recently found that the City's boot, tow, and take regime is designed to collect on a public debt, not to address safety concerns. In *In re Fulton*, the Seventh Circuit Court of Appeals heard an appeal from the bankruptcy court related to the City's "possessory lien" program described above.  *See In re Fulton*, 926 F.3d 916 (7th Cir. 2019), *vacated and remanded sub nom. on other grounds City of Chicago, Illinois v. Fulton*, 141 S. Ct. 585 (2021). The case concerned the City's refusal to release vehicles seized for unpaid ticket debt when a bankruptcy automatic stay required that release. *See id*. at 920. The City justified its refusal, in part, on the police power. The Seventh Circuit disagreed:

> We are persuaded that, on balance, this is an exercise of revenue collection more than police power. As debtors observe, a not insignificant portion of the City's annual operating fund comes from its collection of parking and traffic tickets. Moreover, the kind of violations the City enforces are not traditional police power regulations; these fines are for parking tickets, failure to display a City tax sticker, and minor moving violations. Even tickets for a suspended license, a seemingly more serious offense, are often the result of unpaid parking tickets and are thus not related to public safety. And the City impounds vehicles regardless of what violations the owner has accrued, without distinguishing between more serious violations that could affect public safety versus the mere failure to pay for parking. Most notably, the City imposes the monetary penalty on the owner of the vehicle, not the driver, which signals a seeming disconnect if the City actually has

---

[8]Indeed, the Illinois Vehicle Code provides:

> With respect to any vehicle that has been booted, impounded, or both in accordance with subsection (c) of Section 11-208.3, a city with a population over 500,000 may establish a program whereby the registered owner, lienholder, or other legally entitled person is entitled to any proceeds from the disposition of the vehicle, less any reasonable storage charges, administrative fees, booting fees, towing fees, and parking and compliance fines and penalties.

625 ILCS 5/4-208. Despite the Illinois General Assembly's acknowledgment that an owner should be afforded compensation when the government confiscates his or her vehicle to satisfy ticket debt, the City never adopted an ordinance or program entitling such compensation to the owner.

> safety concerns about the offending driver. As the ordinance amending M.C.C. §
> 9-100-120 demonstrates, the City's focus is on the financial liability of vehicle
> owners, not on public safety.

*Id.* at 929-30 (internal citation omitted); *see also In re Shannon*, 590 B.R. 467, 492 (Bankr. N.D.

Ill. 2018), *aff'd sub nom. In re Fulton*, 926 F.3d 916 (7th Cir. 2019) ("Actions by governments to

collect debts generally do not fall within the police power….").

50.     *In re Fulton* was vacated by the Supreme Court, but the City (wisely) did not

petition the Supreme Court for review of the Seventh Circuit's ruling quoted above. Because this

holding was neither reviewed nor reversed, it "continue[s] to have precedential weight and, until

contrary authority is decided, [is] likely to be viewed as persuasive authority if not the governing

law of the … Circuit." *Los Angeles Cty. v. Davis*, 440 U.S. 625, 646, n.10 (1979).

51.     Other circuits have split with the Seventh Circuit and held that, despite the plain

text of the Fifth Amendment, the taking of property to coerce debtors to pay civil debts is

constitutional. In one case, a district court held the District of Columbia's practice of booting and

selling vehicles solely because their owners owed ticket debt was constitutional, calling it "a sort

of graduated forfeiture process." *See Tate v. District of Columbia*, 627 F.3d 904, 908 (D.C. Cir.

2010). According to *Tate*, despite the lack of any punitive or remedial purpose, it is

constitutional to tow and sell vehicles solely because tickets were unpaid because the practice is

"too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced."

*Id*. at 909.

52.     Better decisions have not simply parroted *Bennis* but recognized that "*Bennis*

emphasized the limits on the government's police power: that any uncompensated forfeiture be

proportional to the health, safety or welfare goals purportedly being achieved by a state." *Baker*

*v. City of McKinney, Texas*, 601 F. Supp. 3d 124, 138 (E.D. Tex. 2022). More than anything, no

matter how "firmly fixed[,]" no practice of unconstitutional seizures can trump the Fifth Amendment.

53.     Ultimately, taking a person's car simply because they owe ticket debt bears no "reasonable relationship to a legitimate purpose within the City's police powers – e.g., the promotion of the health, safety, well-being or welfare of the community." *See Ass'n of Home Appliance Manufacturers*, 36 F. Supp. 3d at 372. It is just the act of a debt collector dressed up as a municipality. It is the very definition of an unconstitutional taking.

### *United Road Towing*

54.     This entire scheme could not work, of course, without the entity that actually tows the vehicles: United Road Towing, "a private towing contractor long-tainted by scandals" that has handled towing operations in Chicago for the past 30 years. Ramos, *Chicago's Towing Program Is Broken*, *supra* at n.1 (citing a number of scandals including, but not limited to, United Road Towing "bilk[ing] the city for $1 million" and an FBI probe into "an interstate auto-theft ring"). Despite its checkered past, in 2016 the City gave United Road Towing a $60 Million contract over five years to handle such work.[9]

55.     The City does not just pay United Road Towing a fee for conducting unpaid ticket tows, it also "pays [United Road Towing] in cars." *See* Ramos, *Chicago's Towing Program Is Broken*, *supra* at n.2. More specifically, the City sells confiscated vehicles to United Road Towing at scrap rates, even when those vehicles have value at auction far in excess of the scrap value. "Chicago has long known that [if] it tows enough cars that it can pay the towing company with some of them, potentially lowering overall towing costs for the city." *Id.* (noting that in

---

[9] The 2016 contract was initially with United Road Towing, Inc., the predecessor to Defendant URT United Road Towing, Inc. who assumed the contract after United Road Towing, Inc.'s Chapter 11 bankruptcy in 2017.

2017 alone the City's tow contractor paid $4 Million to take possession of 24,000 towed vehicles that had a value of more than $22 Million).

56. United Road Towing benefits from this arrangement because it is not just a tow truck operator. Through various subsidiaries, it is also one of the largest auto auction operators in the state of Illinois. *See, e.g.,* United Road Towing Facebook Page, Apr. 9, 2010 ("Our Chicago Auction is live this morning! We have over 150 cars, vans, and trucks available"), https://www.facebook.com/unitedroadtowing/posts/111857412175754. Because it is both a tow company *and* an auction company, United Road Towing can re-title impounded vehicles and sell them at fair market value—earning huge margins over the scrap prices it pays to the City. Smaller tow operators simply do not have this option, which allows United Road Towing to underbid them.

57. Meanwhile, the City benefits from this scheme because, by paying United Road Towing in impounded vehicles, the City is also able to pay United Road Towing under-market rates for its tow services.

58. In other words, if the City could not pay United Road Towing "in cars" the City would have to pay fair market prices for tows, because other tow operators cannot wring profits from tows like United Road Towing does. If they could, the economic incentives for the City's unpaid ticket tow regime would decrease substantially. In this way, United Road Towing is the moving force behind the City's unconstitutional unpaid ticket tows. Thus, this entire regime— from the initial tow to the ultimate disposal of vehicles—is carried out by United Road Towing at the behest of the City under color of law.

### *The Taking of Plaintiffs' Vehicles*

59.     On May 19, 2021, the City towed and impounded Plaintiff O'Donnell's Toyota (License Plate R603485) pursuant to MCC § 9-100-120. The tow was handled and processed by United Road Towing on behalf of the City. The City thereafter disposed of O'Donnell's vehicle not by selling it for fair market value, but rather by selling it at scrap value ($273) to United Road Towing on July 8, 2021. O'Donnell was deprived of the loss of use of his vehicle during the time that the City held it and was permanently deprived of its use after the City sold it for scrap. He was further assessed boot, tow, and storage fees because of the unconstitutional tow of his vehicle. The City did not provide any compensation to O'Donnell for the taking of his vehicle, nor did it offer him a hearing to determine fair compensation for the taking of the vehicle pursuant to MCC § 9-100-120. Nor did the City use any of the proceeds of the sale of his vehicle to off-set the unpaid ticket debt that caused the City to tow and impound O'Donnell's Toyota. United Road Towing resold O'Donnell's Toyota to a third party. Discovery will reveal the identity of the purchase and sales price received by United Road Towing for the resale of O'Donnell's Toyota.

60.     O'Donnell is in fear of obtaining a new vehicle because he has at least six unpaid tickets. If O'Donnell were to obtain a vehicle that ticket debt will render him a target of the City's boot, tow, and take regime.

61.     On January 28, 2018, the City towed and impounded Plaintiff Goree's Chevrolet (License plate # Q622168) pursuant to MCC § 9-100-120. The tow was handled and processed by United Road Towing on behalf of the City. The City thereafter relinquished possession of the vehicle to the lienholder. Goree was deprived of the loss of use of his vehicle during the time that the City held it in its possession and was permanently deprived of its use after the lienholder

redeemed it. He was further assessed boot ($100), tow ($150), and storage ($310) fees because of the unconstitutional tow of his vehicle. Those amounts—for which Goree is liable—were paid to the City. The City did not provide any compensation to Goree for the taking of his vehicle, nor did it offer him a hearing to determine fair compensation for the taking of the vehicle pursuant to MCC § 9-100-120. On information and belief, the lienholder disposed of Goree's Chevrolet by selling it on or around April 19, 2018. None of the proceeds were used to off-set any of the unpaid ticket debt that caused the City to tow and impound Goree's Chevrolet.

62.     Goree's vehicle was _not_ towed, impounded, and disposed of as a result of ticket debt associated with his Chevrolet. Nor was it even towed, impounded, and disposed of for ticket debt that he accumulated or owed. Rather, the co-signor on Goree's vehicle had outstanding ticket debt from a different vehicle. On that basis, the City took and disposed of Goree's Chevrolet without any compensation.

63.     Goree is in imminent danger of the City taking a vehicle that he currently owns without compensation because he has at least two unpaid tickets that render him a target of the City's boot, tow, and take regime.

## CLASS ALLEGATIONS

64.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Procedure on behalf of a class of similarly situated individuals defined as follows:

> All vehicle owners who had their vehicle impounded by the City of Chicago pursuant to MCC § 9-100-120 (the "Class").

65.     The number of class members is so large that joinder of all members is impracticable. As noted above, in 2017 alone the City towed 19,665 vehicles for unpaid ticket debt. *See* Ramos, *Chicago's Towing Program is Broken*, *supra* at n.2. The exact number of class members can be determined from records maintained by Defendants.

66.     Plaintiffs' claims are typical of the claims of other class members as they were all similarly affected by the same boot, tow, and take regime described above.

67.     Common questions exist as to the Class that will predominate over questions, if any, that solely affect individual class members. These common questions include:

a.      Whether the procedures set forth in MCC § 9-100-120 authorizing the taking of vehicles for unpaid ticket debt without providing the vehicle owner with fair compensation, or even a hearing to determine fair compensation, violates the Takings Clause of the United States and Illinois Constitutions.

b.      Whether United Road Towing acts under color of state law when it tows and takes possession of vehicles for unpaid ticket debt pursuant to MCC § 9-100-120.

c.      Whether Plaintiffs and class members are entitled to an injunction preventing the City and United Road Towing from taking vehicles for unpaid ticket debt without providing the vehicle owner with fair compensation or a hearing to determine fair compensation.

d.      Whether it was unjust for the City to retain payment for the sale of vehicles and/or any boot, tow, storage, or other fees it received in connection with the towing and disposal of vehicles pursuant to an ordinance that is unconstitutional.

e.      Whether it was unjust for United Road Towing to retain payment for the sale or resale of vehicles that were towed and disposed of pursuant to an ordinance that is unconstitutional.

68.     Plaintiffs will fairly and adequately protect the interests of members of the class. Plaintiffs retained competent counsel experienced in class action litigation in state and federal courts. Plaintiffs have no interest adverse to any class members. Plaintiffs intend to prosecute this case vigorously on behalf of themselves and the class members.

69.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy because it involves the legality of an ordinance that applies equally to Plaintiffs and all members of the Class. Litigating individual class members' claims would produce a multiplicity of cases, congesting the judicial system, and creating the potential for inconsistent or contradictory judgments. Class treatment, by contrast, provides manageable

judicial treatment calculated to bring a rapid conclusion to the litigation of all claims arising from Defendants' uniform misconduct. Class certification, therefore, is appropriate under Rule 23(b)(3).

70.     Class certification is also appropriate under Rule 23(b)(2) because Defendants have acted, or refused to act, on grounds generally applicable to class members, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

**COUNT I**
**Declaratory and Injunctive Relief – Taking Without Just Compensation**
**(on behalf of Plaintiffs and the Class against Defendants**
**City of Chicago and URT United Road Towing, Inc.)**

71.     Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth herein.

72.     The United States Constitution provides that private property shall not be taken for public use without just compensation. *See* U.S. CONST. amend. V. The Illinois Constitution similarly provides that private property shall not be taken or damaged for public use without just compensation. *See* ILL. CONST. art. I, § 15.

73.     As set forth above, MCC § 9-100-120 provides for the taking of citizen's vehicles for public use without providing any compensation to the owner or even a hearing to determine fair compensation. While confiscation of property will not be considered a taking if the confiscation is a lawful exercise of that government's police powers, the impoundment of vehicles for unpaid ticket debt is not an exercise of police power. *See In re Fulton*, 926 F.3d 916 (7th Cir. 2019), *vacated and remanded sub nom. on other grounds City of Chicago, Illinois v. Fulton*, 141 S. Ct. 585 (2021).

74.     Plaintiffs' vehicles were taken from them by the City without compensation pursuant to MCC § 9-100-120.

75.     Accordingly, MCC § 9-100-120, on its face, violates the Takings Clause of the United States and Illinois Constitutions.

**WHEREFORE**, Plaintiffs pray that the Court:

A.     Certify this case as a class action, designate Plaintiffs as class representatives and appoint Plaintiffs' counsel as class counsel;

B.     Declare that the provisions of MCC § 9-100-120 authorizing the taking of vehicles without compensation or even a hearing to determine fair compensation violate the Takings Clause of the United States and Illinois Constitutions and are therefore void *ab initio*;

C.     Grant preliminary and permanent injunctive relief preventing the City and United Road Towing from towing, impounding, and disposing of vehicles pursuant to MCC § 9-100-120;

D.     Award Plaintiffs and members of the Class restitution in an amount to be determined herein, including pre- and post-judgment interest;

E.     Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

F.     Order such other and further relief as this Court deems equitable, just, and proper.

**COUNT II**
**42 U.S.C. § 1983 – Taking Without Just Compensation**
**(on behalf of Plaintiffs and the Class against Defendants**
**City of Chicago and URT United Road Towing, Inc.)**

76.     Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth herein.

77.     The City's tow, impoundment, and disposal of vehicles without just compensation is its well-settled custom or practice, which was ratified by policymakers for the City with final

policymaking authority. Indeed, the unconstitutional actions alleged herein were taken in connection with the implementation and enforcement of MCC § 9-100-120, an ordinance adopted by its City Council. Thus, the conduct being challenged herein is the official policy of the City. Therefore, all City employees and agents were acting under color of law in carrying out this policy, custom, or practice.

78. United Road Towing was also acting under color of state law because its actions set forth herein are done at the behest of the City and pursuant to an ordinance designed to accomplish the City's purpose of collecting a public debt. Further, the economic impetus of the City's unpaid ticket tows would disappear if it were not able to pay United Road Towing "in cars" due to United Road Towing's status as both a tow company and auto auction operator. This economic rationale is the moving force behind the City's unpaid ticket tows.

79. As a result of this policy, custom, or practice, the taking of Plaintiffs' vehicles, as well as the taking of the vehicles of all members of the Class, was unconstitutional.

80. The misconduct described herein was objectively unreasonable and undertaken intentionally with deliberate indifference to the constitutional rights of Plaintiffs and members of the Class. Alternatively, the misconduct described herein was undertaken intentionally, with malice, and/or with reckless indifference to the constitutional rights of Plaintiffs and members of the Class.

81. As a result of this policy, custom, or practice, the City and United Road Towing deprived Plaintiffs and members of the Class of their constitutional rights to be free from having their property taken without just compensation. As a direct and proximate cause of this deprivation of constitutional rights, Plaintiffs and members of the Class suffered the loss of their vehicles, the imposition of boot, tow, storage, or other fees, and other damages.

**WHEREFORE**, Plaintiffs pray that the Court:

A.     Certify this case as a class action, designate Plaintiffs as class representatives and appoint Plaintiffs' counsel as class counsel;

B.     Award Plaintiffs and members of the Class damages and/or restitution in an amount to be determined herein, including pre- and post-judgment interest;

C.     Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

D.     Order such other and further relief as this Court deems equitable, just, and proper.

**COUNT III**
**<u>Unjust Enrichment</u>**
**(on behalf of Plaintiffs and the Class against Defendant City of Chicago)**

82.     Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth herein.

83.     The City has received payment for the sale of vehicles, as well as for boot, tow, storage, and other fees, in connection with the taking of vehicles pursuant to MCC § 9-100-120. As set forth herein, this was unconstitutional.

84.     Thus, the City has collected funds to which it was not entitled. The City knowingly appreciated and accepted this benefit, which has resulted and continues to result in an inequity to Plaintiffs and members of the Class.

85.     The City has thus unjustly received and retained a benefit belonging to Plaintiffs and members of the Class, who have therefore suffered a commensurate detriment.

86.     The City's retention of this benefit violates the fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Plaintiffs pray that the Court:

A.      Certify this case as a class action, designate Plaintiffs as class representatives and appoint Plaintiffs' counsel as class counsel;

B.      Award Plaintiffs and members of the Class restitution in an amount to be determined herein, including pre- and post-judgment interest;

C.      Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

D.      Order such other and further relief as this Court deems equitable, just, and proper.

**COUNT IV**
**<u>Unjust Enrichment</u>**
**(on behalf of Plaintiff O'Donnell and the Class against**
**Defendant URT United Road Towing, Inc.)**

87.     Plaintiff O'Donnell adopts and incorporates by reference all prior paragraphs as if fully set forth herein.

88.     United Road Towing has received payment for the sale or resale of vehicles that were towed and disposed of pursuant to an ordinance that is unconstitutional.

89.     Thus, United Road Towing has collected funds to which it was not entitled. United Road Towing knowingly appreciated and accepted this benefit, which has resulted and continues to result in an inequity to Plaintiff and members of the Class.

90.     United Road Towing has thus unjustly received and retained a benefit belonging to Plaintiff O'Donnell and members of the Class, who have therefore suffered a commensurate detriment.

91.     United Road Towing's retention of this benefit violates the fundamental principles of justice, equity, and good conscience.

24

**WHEREFORE**, Plaintiff O'Donnell prays that the Court:

A.      Certify this case as a class action, designate Plaintiff O'Donnell as class representative and appoint Plaintiff O'Donnell's counsel as class counsel;

B.      Award Plaintiff O'Donnell and members of the Class restitution in an amount to be determined herein, including pre- and post-judgment interest;

C.      Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

D.      Order such other and further relief as this Court deems equitable, just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues that may be tried and decided by jury.

Dated: February 27, 2023

Respectfully submitted,

By: _____/s/ Jacie C. Zolna_____
One of Plaintiffs' Attorneys

Myron M. Cherry
mcherry@cherry-law.com
Jacie C. Zolna
jzolna@cherry-law.com
Benjamin R. Swetland
bswetland@cherry-law.com
Jeremiah Nixon
jnixon@cherry-law.com
Jessica C. Chavin
jchavin@cherry-law.com
MYRON M. CHERRY & ASSOCIATES LLC
30 North LaSalle Street, Suite 2300
Chicago, Illinois 60602
(312) 372-2100
Firm No. 39807
***Attorneys for Plaintiffs and the Class***